```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JAMES JOHSON,

                          Petitioner,

          -against-

JOSEPH T. SMITH,

                          Respondent.

------------------------------------------------------------X
```

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 16 2014 ★
BROOKLYN OFFICE

MEMORANDUM & ORDER

08-cv-2979 (ENV)

VITALIANO, D.J.,

On July 20, 2001 at around 2:00 a.m., petitioner James Johnson was driving his car in Brooklyn accompanied by friends Darshen Kingsberry, Jack Govan, Erika Ellis and Kingsberry's three-year old daughter. The trip was interrupted by mechanical failure. As petitioner and his friends stood stranded at a gas station, a passerby, Rupinder Singh, pulled over in a Lincoln Navigator and offered the group a ride. Singh drove them to an apartment building, also in Brooklyn, at which time Johnson and Govan drew guns and forced Singh into the back of the Navigator. Govan then drove the group to a nearby park where petitioner and Kingsberry dragged Singh out of the Navigator and forced him to the ground. As Singh pleaded for his life, petitioner shot him point-blank in the head, killing him. Johnson and his friends then took $11 and some credit cards from Singh's wallet and spent the remainder of the night snorting cocaine and smoking marijuana at a friend's apartment.

Later that morning, Johnson and Kingsberry drove the Navigator around Brooklyn attempting to locate a "chop shop" at which to dispose of the stolen vehicle. Around 10:00 a.m., the group spoke with Lamont Reynolds, an acquaintance that the group believed would help them with the vehicle disposal. Unbeknownst to petitioner and his friends, however, Reynolds was actually a confidential informant, and he promptly reported the incident to police. Shortly afterwards, on July 21, 2001, petitioner and his co-conspirators were arrested and transported to the 81st precinct. After waiving his *Miranda* rights, petitioner gave both a written and videotaped confession in which he admitted that he shot and killed Singh.

During his plea negotiations, Johnson was represented by Russell Neufeld, Colleen Brady and Gary Alexion of the Legal Aid Society, Capital Division. As the trigger-man, petitioner was facing the possibility of a death sentence under then-existing New York law. Ultimately, on February 28, 2002, petitioner pled guilty to two counts of murder in the first degree and various lesser counts. The plea agreement was contingent upon petitioner's waiver of his right to appeal and right to bring any post-conviction motions. On March 15, 2002 Johnson was sentenced to life imprisonment without the possibility of parole, in accordance with the plea agreement. Petitioner's co-conspirators Kingberry and Govan were later tried jointly and were both convicted of murder in the second degree and sentenced to 25 years to life.

Following his sentencing, petitioner filed an appeal with the Appellate Division, Second Department. Counsel appointed to represent him on that appeal

filed an *Anders* brief asking to be relieved because his review of the record uncovered no non-frivolous issues for appeal. Petitioner, however, filed a *pro se* supplemental brief raising three arguments: (1) the trial court lacked authority to accept his guilty plea because the prosecution's notice of intent to seek the death penalty was still pending at the time of the plea; (2) petitioner's trial counsel coerced petitioner into accepting the guilty plea; and (3) the trial court should have inquired into a potential conflict of interest between petitioner and his trial counsel as a result of a *pro se* motion that petitioner filed at sentencing seeking to withdraw his guilty plea. On December 29, 2005, the Second Department affirmed the judgment, agreeing with appellate counsel that there were no non-frivolous issues and rejecting on the merits all of the claims in Johnson's supplemental brief. The Court of Appeals denied petitioner's leave request on April 26, 2006.

On May 3, 2007, Johnson filed a motion in the Appellate Division for a writ of error *coram nobis*, in which he alleged that his appellate counsel's representation was constitutionally deficient because counsel failed to argue that trial counsel was ineffective in three ways: (1) allowing petitioner to plead guilty while a notice of intent to seek the death penalty was pending; (2) failing to object that the trial court lacked authority to accept his guilty plea given the pending death notice, and (3) failing to pursue a "mental retardation" defense. The Second Department denied the motion. The Court of Appeals denied leave to appeal.

On July 8, 2008 petitioner moved in Supreme Court, Kings County, pursuant to CPL § 440.10 to vacate the judgment. Petitioner argued that his trial counsel was ineffective in (1) failing to adequately investigate his competence to stand trial; (2)

3

failing to investigate a potential defense of mental retardation; (3) coercing him into pleading guilty; and (4) operating under a conflict of interest. Johnson also claimed in that motion that his guilty plea was involuntary and violated due process because the judge accepted it without ordering a mental competency examination. Supreme Court denied the motion, concluding that certain of Johnson's claims were barred by his waiver of the right to appeal, and that, regardless, all of his claims lacked merit. Petitioner's leave application was denied by the Second Department.

Petitioner filed the instant action seeking a writ of habeas corpus, proceeding *pro se*, on May 19, 2009. Johnson contends here that his trial counsel was ineffective. He cites four reasons: (1) failing to investigate or pursue a potential defense of mental retardation; (2) coercing petitioner into pleading guilty; (3) maintaining representation despite a conflict of interest; and (4) failing to step aside following petitioner's submission of a *pro se* motion to withdraw the guilty plea he had advised Johnson to accept. Johnson also claims now that his appellate counsel was ineffective in failing to highlight two alleged failings of trial counsel: (1) allowing petitioner to plead guilty while the death notice was pending, and (2) not pursuing a mental retardation defense. Additionally, petitioner argues that his guilty plea was invalid because the state court failed to conduct hearings on his mental competency and his motion to withdraw the guilty plea. Finally, Johnson claims that his guilty plea violated his constitutional rights because it occurred while the death notice was pending. For the reasons discussed below, the Court concludes that the writ shall not issue and the petition should be dismissed with prejudice.

## Standard of Review

This petition is subject to AEDPA, which provides that a federal writ of habeas corpus may not be granted to a state prisoner held subject to the judgment of a state court unless "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000) (citation omitted). Clearly established federal law "'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *See Carey v. Musladin*, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (*quoting Williams*, 529 U.S. at 412, 120 S. Ct. at 1523). To be "clearly established" under AEDPA, federal law must be "law that is 'dictated by [Supreme Court] precedent existing at the time the defendant's conviction became final.'" *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003) (citation omitted). A state court's "unreasonable application" of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (internal quotation omitted). This is a highly deferential standard, as § 2254(d) "demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005). "If this standard is difficult to meet—and it is—that is because it was meant to be." *Burt v. Titlow*, 2013 WL 5904117, at *4 (2013) (internal citations omitted). Federal courts should not "lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas review is the remedy." *Id.*

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-part inquiry set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. But, there is, of course, "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (*quoting Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). Second, a petitioner must "affirmatively prove prejudice," demonstrating that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94, 104 S. Ct. at 2067-68).

"In the context of plea negotiations, a defendant can make this showing by producing both a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for his counsel's deficient performance and also some additional 'objective evidence' supporting his claim." *United States v. Frederick*, 2013 U.S. App. LEXIS 9038, at *3 (2d Cir. 2013). "This 'objective evidence' can be a large disparity between the defendant's advised and actual sentencing exposure." *Id.* "Even with such a disparity, however, the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible." *Id.*

Finally, it is axiomatic that *pro se* complaints are held to less stringent

standards than pleadings drafted by attorneys and the Court is required to read the plaintiff's *pro se* complaint liberally and interpret it raising the strongest arguments it suggests. *Erickson v. Pardus*, 551 U.S. 89 (2007); *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 191-93 (2d Cir. 2008). That obligation is engrained on a court's review of habeas pleadings as well, even in the AEDPA context.

## Discussion

### I. Ineffective Assistance of Trial Counsel

#### a. Mental Retardation Defense

Petitioner contends that his trial counsel was ineffective in failing to pursue a potential mental retardation defense during plea negotiations. The state court concluded that this argument was procedurally barred based on petitioner's waiver of his right to appeal, and further concluded that "[e]ven if the court were to consider this allegation the result would be the same [because] the defendant has not presented credible evidence of the viability of a defense based on his purported mental retardation." (Respondent's Ex. S at 2.) As an initial matter, this sort of "contingent observation" made by the state court is not equivalent to an adjudication of the claim on the merits, and therefore the Court reviews this claim *de novo* rather than under AEDPA's highly deferential standard. *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007), keeping in mind, though, that if this claim, making no suggestion of actual innocence, was procedurally defaulted it cannot afford petitioner any federal habeas relief.

Assuming, *arguendo*, that merits review is appropriate, even without the

7

benefit of AEDPA deference the Court concludes that there was nothing deficient about counsel's decision not to advise Johnson to go to trial based on the potential availability of a mental retardation defense. In advancing this claim, Johnson relies heavily on a mitigation report, dated January 28, 2002—one month prior to his plea allocution—which indicates that he had an IQ of 61. According to petitioner, knowledge of this fact should have caused his trial counsel to investigate the possibility that he was mentally retarded, and, concomitantly, should have advised petitioner that he could and should proceed to trial with a defense of mental retardation. The argument ignores a fundamental flaw. The section of the mitigation report referenced by Johnson also states that "it is probable that [Johnson's] Full Scale I.Q. score of 61 was caused by factors other than just his poor intellectual functioning" and that the mitigation specialist was therefore "not asserting that James Johnson is mentally retarded." (Petitioner's Ex. 6.)

More problematic, petitioner's actions following the murder were not consistent with a condition of mental retardation. Johnson had the wherewithal to change his blood-stained shirt, seek out a "chop shop" to dispose of the Navigator and attempt to discard his gun as he was about to be arrested by police. In addition, in his written and videotaped confessions, he had the presence of mind to attempt to minimize his own responsibility in deciding to shoot the victim. Petitioner points to no sign, symptom or evaluation available either before or after trial, other than the observation in the mitigation report discredited by the evaluator who made it, suggesting that Johnson suffered from any mental retardation condition or disability. Given the micro-thin suggestion of retardation and the low probability of

8

success generally for mental retardation defenses, it was entirely reasonable for trial counsel to conclude that proceeding to trial on such a defense was not in petitioner's best interest.[1] Accordingly, the Court concludes that counsel's decision to not investigate or pursue a mental retardation defense was not constitutionally deficient.

### b. Coercion to Plead Guilty

Johnson next argues that trial counsel was ineffective because he coerced him to plead guilty rather than taking his chances at trial. Petitioner raised this claim in his 440.10 proceeding and the state court rejected it on the merits as lacking any support by the facts of record. (Respondent's Ex. S at 3) ("Defendant's claim of coercion by defense counsel is baseless.") Accordingly, the Court reviews that determination under AEDPA's highly deferential standard of review.

Petitioner claims that defense counsel coerced him into pleading guilty by telling him that he would not be able to confront certain witnesses at trial; that pleading guilty would be doing "right in God's eyes"; and that his family problems would be brought into the open if he went to trial. But, these words are not the only words spoken by Johnson regarding the advice he received from counsel in connection with his decision to plead guilty. Petitioner's claims are directly contradicted by the words he spoke at his plea allocution on February 28, 2002. At

---

[1] In February 2002, at the time of Johnson's plea, there was no federal Constitutional ban on the execution of mentally retarded individuals, but New York's death penalty statute did expressly exempt mentally retarded individuals from receiving the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (June 20, 2002); NYCPL § 400.27 ("If the court finds the defendant is mentally retarded, the court shall set aside the sentence of death . . ."). New York law did not have a specific IQ threshold to indicate whether or not an individual was mentally retarded. *Id.*

that time Johnson stated that he was satisfied with his representation; that he discussed potential defenses with his counsel; that he understood the consequences of pleading guilty, including his waiver of the right to appeal; and that he was pleading guilty voluntarily and of his own free will. (Respondent's Ex. S.) Sworn statements made in open court are not consequence free throw-away lines. Sworn testimony at a plea allocution "carries [] a strong presumption of accuracy" that outweighs "later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made." *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001); *Maldonado v. United States*, 2009 U.S. Dist. LEXIS 41669, at *7 (S.D.N.Y. 2009); *United States v. Cano*, 190 Fed. Appx. 34, 37 (2d Cir. 2006).

As further evidence, petitioner offers affidavits from himself and two aunts suggesting that his counsel exerted substantial pressure on him to accept the People's plea offer of life imprisonment. Most notably, petitioner submits a letter allegedly written by his trial counsel urging him to plead guilty because it was the correct thing to do "in God's eyes." (Petitioner's Ex. 4.) Nonetheless, at bottom, nothing in the letter is objectively false. It demonstrates what is really uncontested, that is, defense counsel, with a client facing a capital charge and knowing the evidence against him, strongly believed his client should accept a plea deal sparing him death. Moreover, fairly read, the affidavits offered by petitioner indicate that counsel offered, and petitioner understood it that way, a blunt and realistic view of his slim chances of success at trial. Indeed, given the overwhelming evidence against petitioner, there is no question that pleading guilty in exchange for a life sentence was an eminently reasonable strategy in this case. In any event, the Court cannot

10

conclude that the determination by the state courts that trial counsel did not coerce Johnson into pleading guilty, and, therefore, was not constitutionally ineffective as petitioner claims on this point, was contrary to clearly established federal law. Johnson certainly comes nowhere close to the kind of showing on the facts and the law necessary to support a contrary conclusion.

### c. *Conflict of Interest*

Petitioner contends that his trial counsel was constitutionally ineffective for having a "conflict of interest", namely that his lawyer was actually attempting to assist the prosecution rather than advocate for him. Petitioner offers two facts in support of this claim. First, he notes that counsel advised him to extend the statutory 120-day period during which the prosecution could determine to seek the death penalty; and, second, that counsel provided him with a script, prepared by the prosecution, to help him rehearse for his plea allocution. Johnson raised both of these arguments in state court, where they were rejected on the merits. They are ripe on this application for AEDPA's highly deferential standard of review.

"A defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a 'per se' conflict, a potential conflict of interest that results in prejudice to the defendant, or an actual conflict of interest that adversely affects the attorney's performance." *Armienti v. United States*, 313 F.3d 807, 810 (2d Cir. 2002). A "per se" conflict exists only where there is an "actual or constructive denial of the assistance of counsel altogether." *Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993) (citation omitted). "An actual conflict between a lawyer and his client exists when, during the course of the representation,

11

the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Armienti* at 811 (citation omitted). Finally, a potential conflict of interest exists "if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (citation omitted). Importantly, to violate the Sixth Amendment, any such conflict must also result in prejudice to the defendant. *Id.*

Petitioner has not come close to meeting any of the three benchmarks that would establish the presence of a conflict of interest, much less has he demonstrated that any conduct he alleges to be a conflict resulted in prejudice to him. Indeed, the two incidents that Johnson discusses—extension of the 120-day death notice period and the plea script—were ordinary actions taken by defense lawyers during plea negotiation in an effort to secure the best deal for their clients. More importantly, there is absolutely nothing in the record suggesting that petitioner's counsel undertook these actions to benefit his own interests at the expense of his client. Finally, Johnson has utterly failed to demonstrate how either action caused him any prejudice whatsoever. Accordingly, the Court concludes that the state court did not err in holding that petitioner failed to demonstrate that his attorney acted under a conflict of interest, much less err in finding that the incidents petitioner alleged did not support a finding that his counsel was constitutionally ineffective.

### d. Counsel's Failure to Recuse Himself

Johnson's final trial counsel ineffectiveness claim relates to his attorney's failure to recuse himself when petitioner submitted a *pro se* motion seeking to

withdraw his guilty plea. That motion raised, among other things, the alleged conflict of interest he raises again in this habeas application. Critically, however, petitioner never raised this argument in the state courts. Petitioner's supplemental brief submitted on direct appeal argued that the trial court improperly denied his motion to withdraw his guilty plea. (Petitioner's Ex. B at 10-11.) Clearly, the argument that the trial court erred in refusing to give back his plea is distinct from the one petitioner advances here—namely, that his trial counsel should have immediately moved to withdraw after the *pro se* motion was submitted. Petitioner also did not include this argument in his leave application to the Court of Appeals. (Respondent's Ex. I.) Since petitioner failed to exhaust this claim in state court, it is procedurally barred and the Court will not consider it further. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

## II. The Court's Failure to Conduct Hearings

Petitioner next contends that his guilty plea was invalid given that the sentencing court declined to hold hearings on two issues: his mental competency and his motion to withdraw his guilty plea. Petitioner raised both of these arguments in his 440.10 proceeding and both were rejected on their merits. They are renewed here as AEDPA permits.

"The Due Process Clauses of the Fourteenth and Fifth Amendments prohibit the criminal prosecution of a defendant who is not competent to stand trial, and that right to due process is violated if a criminal defendant who is incompetent pleads guilty." *United States v. Ioulevitch*, 508 Fed. Appx. 73, 74 (2d Cir. 2013). A trial court must hold a competency hearing if there is "reasonable cause to believe that

13

the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). However, "if no reasonable cause exists, a court has no obligation to hold a competency hearing." *Ioulevitch* at 74. In considering whether to hold a hearing, "there are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Harris v. Kuhlmann*, 346 F.3d 330, 350 (2d Cir. 2003).

Missing from petitioner's application is any demonstration that there was reasonable cause requiring the trial court to conduct a competency hearing before accepting his guilty plea. Johnson pegs this claim to three paragraphs in a mitigation report indicating that he might suffer from bi-polar disorder, equivocally that he had an IQ of 61[2] and a history of substance abuse. (Petitioner's Ex. 6.) He points to nothing else in the record—no aberrant court behavior, no inappropriate comments, no inability to make intelligent responses—that would suggest to a reasonably observant trial judge that his competency was reasonably in question. Certainly, there was no suggestion from defense counsel to that effect. The short of it is that nothing suggested that Johnson's mental competency might fall below New York's standard for trial. The court's determination about Johnson's competence

---

[2] As noted above, the mitigation report questioned the reliability of the IQ determination and specifically concluded that Johnson was not mentally retarded. Nor was there the slightest expression of concen in the report that Johnson was not competent to offer a plea.

based on in-person observation is entitled to deference. *Kuhlmann* at 355. Accordingly, the Court concludes that the Appellate Division's determination that the trial court did not violate petitioner's due process rights in failing to conduct a hearing on his mental competence was not contrary to clearly established federal law.

Johnson raises a second due process claim, arguing that the trial court should have conducted a hearing on his motion to withdraw his guilty plea. Respondent, citing *Grey v. Hoke*, 933 F.2d 177 (2d Cir. 1991), retort that, although petitioner raised this argument to the Second Department, it is procedurally defaulted here because he did not explicitly include this argument in his leave application to the Court of Appeals. (Respondent's Mem. at 48.) However, cases subsequent to *Grey* have clarified that "when a petitioner either attaches an appellate brief to his application for leave to appeal without discussing any specific claims or asserts only some claims in the leave to appeal application and then explicitly states that the appellate brief is enclosed, every issue discussed in the appellate brief is fairly presented to the highest court of the state." *Pines v. Barkley*, 2006 U.S. Dist. LEXIS 99720, at *8-9 (S.D.N.Y. 2006). This is just what Johnson did. His leave application clearly states that he "attach[ed] the briefs from the Appellate Division." (Respondent's Ex. I.) In line the preceding case law, and mindful that petitioner proceeds *pro se*, the Court will consider his argument on the merits.

The mountain remains high nonetheless. "Both federal and state precedent have established that a defendant is not entitled as a matter of right to an evidentiary hearing on a motion to withdraw a guilty plea." *Hines v. Miller*, 318

15

F.3d 157, 162 (2d Cir. 2003). "In light of these precedents, the failure to hold an evidentiary hearing on a motion to withdraw a plea does not offend a deeply rooted or fundamental principle of justice." *Id.* Harmoniously, the Appellate Division ruled that the trial court did not abuse its discretion in electing not to hold such a hearing.[3] That decision was hardly an unreasonable application of clearly established federal law.

### III. Guilty Plea While Death Notice Was Pending

Johnson, essentially, contests the voluntariness of his plea, claiming its invalidity because it was taken at a time when the prosecution had not withdrawn its notice of intention to seek the death penalty. He raised this argument in his state court proceedings, and it was rejected on the merits. It is, therefore, exhausted and reviewable on the merits in a federal habeas proceeding.

Under New York death penalty law as it existed at the time of Johnson's plea, a sentence of death could not be imposed unless, within 120-days of defendant's arraignment, the People filed a notice of intent to seek the death penalty. N.Y. Crim. Proc. Law § 250.40. Further, a defendant could not plead guilty to first-degree murder while a notice of intent to seek the death penalty was pending. *Hynes v. Tomei*, 92 N.Y.2d 613, (1998). Here, however, it appears from the record that there was no death notice pending at the time petitioner entered his plea.

Petitioner pled guilty on February 28, 2002. The People filed a notice of

---

[3] The trial court, of course, had previously allocuted the plea at a hearing during which Johnson gave sworn testimony that his plea was knowing and voluntary. In denying a hearing, the trial court merely did not allow Johnson to contradict under oath his previously sworn testimony to the opposite effect.

intent to seek the death penalty also on February 28, 2002. (Petitioner's Ex. E.) That notice stated that "the People intend to seek the imposition of the death penalty in the event that the defendant is convicted of Murder in the First Degree." (*Id.*) Given that the notice was filed on the same date upon which Johnson pleaded guilty, it is unclear which was filed first, or whether the notice was withdrawn prior to entry of petitioner's plea. During petitioner's plea allocution, however, the trial judge stated that "the prosecution is reserving their right to file a notice of intent to seek the death penalty should it occur anytime in the future that your plea of guilty is withdrawn or vacated." (Respondent's Ex. A.) The trial court further noted that "[i]f you went to trial with a jury and were found guilty of Murder in the First Degree, and the prosecution *had filed a notice of intent to seek the death penalty*, the sentence would be determined by a jury." (*Id.*) (emphasis added). Taken together, the filings and the trial court's comments make manifest that the notice had been withdrawn pending the plea.

In any case, "even if a death notice had been filed and petitioner had pled guilty while it was pending, petitioner's guilty plea would not be invalid" as long as it was "knowingly and voluntarily made." *Batts v. Conway*, 2008 U.S. Dist. LEXIS 32941, at *16 (E.D.N.Y. 2008); *Arroyo v. Williams*, 2011 U.S. Dist. LEXIS 69472, at *7 (N.D.N.Y. 2007) ("The ultimate question of whether a guilty plea was knowing and voluntary is a question of federal law"). That is to say, if the timing of Johnson's plea somehow violated New York law, that violation is not reviewable in a federal habeas action. Petitioner's statements at his plea allocution clearly communicate that his guilty plea was knowing and voluntary. (*See* Respondent's

17

Ex. S.) Accordingly, the rejection by the state courts of petitioner's claim that his guilty plea was constitutionally infirm was not contrary to clearly established federal law, much less a finding that was objectively unreasonable if erroneous.

IV. Ineffective Assistance of Appellate Counsel

Petitioner argues that his appellate counsel—who filed an *Anders* brief stating that petitioner had no non-frivolous claims—was deficient in failing to raise two issues with respect to trial counsel's performance. Specifically, Johnson asserts that appellate counsel should have challenged the performance of trial counsel in (1) encouraging him to plead guilty while a death notice was pending, and (2) failing to pursue a mental retardation defense. The state courts considered both arguments and rejected them on the merits.

To begin, appellate counsel does not have a duty to raise every colorable claim on appeal. *Dupont v. Phillips*, 2012 U.S. Dist. LEXIS 88511, at *54 (E.D.N.Y. 2012) ("[A] criminal defendant has no constitutional right to make appellate counsel raise every nonfrivolous issue requested by a client.") Indeed, appellate counsel is entitled to exercise discretion in determining which arguments present an appellant with the best opportunity to achieve a favorable result on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). Further, "[d]ue to the difficulties inherent in an analysis that requires adopting counsel's perspective and then rendering an after-the-fact assessment of performance, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Holmes v. Bartlett*, 810 F. Supp. 550, 561 (S.D.N.Y. 1993).

Jumping ahead to the merits, as discussed above, neither of the claims of trial

counsel ineffectiveness advanced by petitioner has any merit. If appellate counsel, as now is apparent, concluded the same, counsel was under no obligation to pursue them. This is precisely the situation an *Anders* brief is designed to meet. *See Feb. 23, 2005 Anders Brief*, Respondent's Ex. D, at 12 ("Because defendant's plea and sentence were legal and proper, there are no non-frivolous issues on appeal.") Moreover, layered on top of this, Johnson had agreed to an appellate waiver as part of his plea. Unless counsel had reason to believe that the waiver was invalid, and, as discussed above, there was none, appellate counsel would have been barred from advancing these two claims because such an appeal had been waived by Johnson. At foundation, given the multiple grounds on which these arguments were non-meritorious, the determination by the state courts that appellate counsel was not deficient for failing to pursue them was not contrary to clearly established federal law, nor can it be said to have injured the interests of petitioner in any way.

## Conclusion

For the foregoing reasons, the petition of James Johnson for a writ of habeas corpus is dismissed and the writ is denied.

Since Johnson has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is ordered to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
April 1, 2014

s/Eric N. Vitaliano

**ERIC N. VITALIANO**
**United States District Judge**